NOT DESIGNATED FOR PUBLICATION

No. 118,023

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KEITH LUMRY,
*Appellant*,

v.

STATE OF KANSAS, KANSAS BUREAU OF INVESTIGATION, and ROBERT BLECHA,
*Appellees*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed October 5, 2018. Reversed and remanded with directions.

*Alan V. Johnson*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Topeka, for appellant.

*Bryan C. Clark*, assistant solicitor general, *Toby Crouse*, solicitor general, and *Derek Schmidt*, attorney general, for appellees.

Before MCANANY, P.J., PIERRON, J., and WALKER, S.J.

PER CURIAM: Plaintiff Keith Lumry's retaliatory discharge employment case returns to this court following the Kansas Supreme Court's remand to the district court in *Lumry v. State*, 305 Kan. 545, 385 P.3d 479 (2016). In the first appeal, the Supreme Court found that Lumry had established a prima facie case against the Kansas Bureau of Investigation (KBI) to support a common-law retaliatory discharge claim for engaging in protected rights under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3) (2012). 305 Kan. at 561. The Supreme Court remanded the case for the district court to

determine whether (1) former KBI Director Robert Blecha, who was sued in his individual capacity, was protected by sovereign immunity; (2) whether there was a factual dispute as to the retaliatory discharge claim under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-07, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); and (3) whether Lumry has sufficient alternative remedies under the FLSA to foreclose a state common-law retaliatory discharge claim. 305 Kan. at 567-69.

Following remand, the State of Kansas, the KBI, and Blecha (hereinafter the defendants), filed a second motion for summary judgment motion addressing all these issues. The district court once again granted summary judgment to the defendants. Lumry again appeals to this court. Because we are convinced there are genuine issues of material fact which remain, we reverse the district court's grant of summary judgment to defendants and remand for further proceedings.

FACTS

The facts here have already been summarized in both the prior Court of Appeals decision, *Lumry v. State*, 49 Kan. App. 2d 276, 277-82, 307 P.3d 232 (2014) (*Lumry I*), and the subsequent Kansas Supreme Court decision *Lumry v. State*, 305 Kan. 545, 547-50, 385 P.3d 479 (2016) (*Lumry II*). As a result, this opinion will simply summarize those facts. Because the case was resolved on a summary judgment motion, the facts must be read in the light most favorable to the nonmoving party. *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

At the outset, it should be noted that our factual synopsis is based primarily on the Supreme Court's findings made in the prior appeal. But we have been hampered in considering the issues in this new appeal because the record on appeal contains the summary judgment motions which were subject to the first appeal, but only the exhibits/transcripts appended to the defendants' motion, not Lumry's. Likewise, the

2

record also includes the postremand motions and responses, but again the depositions and exhibits referenced by Lumry are also not included in the record. As a result, we have been forced to ignore some of Lumry's asserted facts unless those facts are confirmed beyond the mere allegations in the motions. This has complicated determining the relevant facts which were before the district court.

Keith Lumry was hired as an agent with the KBI in October 2001. He was assigned to the southwest Kansas special unit as a narcotics agent. From the time of his employment until early January 2008, Lumry worked under the direct supervision of Supervisory Agent in Charge Kelly Ralston. For many years under Ralston's supervision, Ralston would complain about Lumry's overtime hours, advising Lumry that there was no money in the budget for any additional overtime. Lumry reported that he "negotiated" with Ralston every two or three months about how many overtime hours per week that he could claim. Lumry would then authorize Ralston to modify his timesheet to reduce the overtime hours that Lumry reported for payroll purposes. Lumry testified that this caused many overtime hours to be "shaved" off his timesheet and that went unpaid. Lumry stated that it was KBI practice for agents routinely to reduce the claims of overtime hours worked. *Lumry II*, 305 Kan. at 547-48.

In the late fall of 2007, the KBI was creating a Southwest Kansas Drug Task Force (task force) headed by Special Agent Clint Hawkins. Lumry was assigned to this task force. *Lumry II*, 305 Kan. at 547. In October 2007, Lumry had a tense conversation with Hawkins reporting that he would no longer work without getting paid for overtime, although he told Hawkins that he would work up to five hours of unpaid overtime per week. 305 Kan. at 548.

In February 2008, Hawkins started an informal investigation into Lumry's timesheets. Hawkins suspected that Lumry was reporting more hours than he actually worked. Hawkins asked Ralston to send him Lumry's timesheet for the week of February

11-15, 2008, to review the activities and time Lumry reported. Hawkins compared Lumry's timesheets with several other task force members and concluded that Lumry was reporting time which he did not work. *Lumry II*, 305 Kan. at 548. Through an e-mail to Ralston in late February, Hawkins summarized his review of the timesheets and reported that he believed the timesheet errors were not mistakes, but were an "integrity issue."

By the end of February 2008, Ralston reported Hawkins' findings up the chain of command at the KBI, including to Blecha. The next day, Blecha directed his subordinates to begin an administrative investigation. Assistant Director Tony Weingartner ultimately requested that Special Agent in Charge Randy Ewy undertake the investigation into Lumry's time reporting. Within a week, Ewy interviewed Hawkins. At the end of March 2008, Ewy interviewed Lumry about his timesheets and the hours that looked questionable. Lumry, however, did not keep daily logs and simply waited until the end of the payroll period to recall the time he spent working on different cases. Because of this practice, Lumry had difficulty recalling the details of his work for the payroll period in question since six weeks had passed and tried to explain his work hours to Ewy. Lumry reported that he may have recorded his time worked under the wrong case number and tried to explain why he recorded time worked on a closed investigation. During this interview, Lumry also told Ewy that he had regularly failed to report overtime in the past with his supervisors' knowledge. Lumry also requested that he be allowed to take a polygraph to confirm his statement.

Ewy submitted his initial report to KBI Associate Director Wiley Kerr on May 1, 2008. Ewy opined that Lumry's timesheets appeared to overstate the time he worked for the two time periods he reviewed. But Ewy could not conclude whether Lumry's errors were just mistakes or deliberate falsehoods. 305 Kan. 548. Ewy suggested that a polygraph examination could be helpful in determining Lumry's intent.

4

Shortly after this report, Blecha placed Lumry on administrative leave. Two weeks later, Blecha sent Lumry a letter proposing to terminate his employment based on the conclusion that Lumry "'knowingly and willfully" falsified timesheets. Lumry pursued an administrative appeal, but Blecha reconfirmed his decision to terminate Lumry's employment. 305 Kan. at 549.

Following his termination, Lumry filed a complaint with the U.S. Department of Labor for uncompensated overtime which resulted in an award in excess of $20,000 that the KBI paid to Lumry and several other KBI employees. Although he started the administrative process, Lumry subsequently abandoned an appeal to the Kansas Civil Service Board. Instead, he sued the defendants in federal court. That case, however, was dismissed because of the State's Eleventh Amendment immunity. See *Lumry II*, 305 Kan. at 549.

Finally, Lumry filed the present action in Shawnee County District Court against the State of Kansas and the KBI, as well as Hawkins, Ralston, and Blecha in their individual capacities. Following some discovery, the district court granted the defendants' motion for summary judgment on all claims. That decision was appealed and the Supreme Court affirmed in part and reversed in part. The Supreme Court found that Lumry had established a prima facie case against the KBI to support a common-law retaliatory discharge claim for engaging in protected rights under the FLSA, 29 U.S.C. § 215(a)(3). The Supreme Court remanded the case for the district court to determine whether (1) Blecha, who was sued in his individual capacity, was protected by sovereign immunity; (2) whether there was a factual dispute as to the retaliatory discharge claim under the *McDonnell Douglas Corp.* burden-shifting analysis; and (3) whether Lumry has sufficient alternative remedies under the FLSA to foreclose a state common-law retaliatory discharge claim. 305 Kan. at 567-69.

Following other motions filed after remand, the district court again granted summary judgment to the defendants. The district court rejected Blecha's claim to sovereign immunity. The court did find, however, that Lumry had failed to establish that the KBI's reason for his termination was a pretext for unlawful retaliation, entitling Blecha to qualified immunity. The court also found that the FLSA provided sufficient alternative remedies to preclude a state common-law claim for retaliatory discharge. Lumry again timely appealed.

SOVEREIGN IMMUNITY

Before addressing Lumry's arguments on appeal, we must first address the immunity issues raised by the defendants: whether Blecha is entitled to sovereign immunity and/or qualified immunity on the personal claims against him. In his petition, Lumry claimed Blecha terminated his employment in retaliation for Lumry's statements that he would no longer work unpaid overtime as he had historically been required to do contrary to the FLSA. Although Lumry sued Blecha in his individual capacity, the defendants assert Blecha was entitled to sovereign and/or qualified immunity.

Whether a party is protected by sovereign immunity is a question of law subject to unlimited review. *Mojsilovic v. Oklahoma ex rel. Board of Regents for University of Oklahoma*, 841 F.3d 1129, 1131 (10th Cir. 2016); *Purvis v. Williams*, 276 Kan. 182, 192, 73 P.3d 740 (2003).

Blecha argued that the KBI and State of Kansas were the real parties in interest in Lumry's claims, and thus he was entitled to sovereign immunity. Courts recognize that because of the Eleventh Amendment to the United States Constitution, a state officer cannot be sued in his or her *official* capacity for wrongful conduct as a state actor. See *Alden v. Maine*, 527 U.S. 706, 757, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999). The U.S. Supreme Court has held, however, that a state officer being sued in his *individual*

6

*capacity* is not entitled to sovereign immunity so long as the plaintiff's relief is sought from the individual, not the state treasury. 527 U.S. at 757. The district court, after extensive analysis, rejected Blecha's sovereign immunity defense. The court explicitly found that Lumry sued Blecha individually and was seeking recovery from Blecha only.

Neither Blecha nor the State cross-appealed from the district court's adverse ruling on the sovereign immunity issue. As the defendants well know from the prior appeal, the failure to cross-appeal from an adverse decision by the district court generally bars the prevailing party from challenging the lower court's ruling on that issue. See *Lumry II*, 305 Kan. at 553-54 (because defendants failed to cross-appeal, they were barred from challenging trial court's decision that Blecha was an "employer" under FLSA); K.S.A. 2017 Supp. 60-2103(h).

In this appeal, however, the defendants reassert the sovereign immunity claim by arguing that Lumry's claims against Blecha were a "mere subterfuge" for a claim against the State. In doing so, the defendants suggest that Blecha's right to sovereign immunity deprives this court of subject matter jurisdiction, and subject matter jurisdiction may be raised at any time. *Connelly v. Kansas Highway Patrol*, 271 Kan. 944, 962, 26 P.3d 1246 (2001).

The Kansas Supreme Court has recognized in more than one case that sovereign immunity is an issue of jurisdiction, which must always be considered by any court. See *Connelly*, 271 Kan. at 962; *Goldbarth v. Kansas State Board of Regents*, 269 Kan. 881, 894, 9 P.3d 1251 (2000). In the prior appeal, the court also recognized that "[s]overeign immunity thus 'enforce[s] an important constitutional limitation on the power of federal courts'" as well as state courts. *Lumry II*, 305 Kan. at 570. These rulings are consistent with the United States Supreme Court's and Tenth Circuit's decisions finding sovereign immunity was a jurisdictional limitation on the courts. See *Michigan v. Bay Mills Indian Community*, 572 U.S. ___, 134 S. Ct. 2024, 2030, 188 L. Ed. 2d 1071 (2014); *Garling v.*

*United States Environmental Protection Agency*, 849 F.3d 1289, 1294 (10th Cir. 2017) (sovereign immunity precludes federal court jurisdiction).

Because the sovereign immunity claim, as framed on appeal by the defendants, involves this court's subject matter jurisdiction, we are required to consider the issue despite Blecha's failure to cross-appeal from the lower court's adverse decision. Issues relating to the court's subject matter jurisdiction may be raised at any time. *Peterson v. Ferrell*, 302 Kan. 99, 102-03, 349 P.3d 1269 (2015).

The defendants assert that the district court erred in finding that Lumry could hold Blecha financially accountable for his actions, even by suing him in his individual capacity because it is a mere ruse to evade Eleventh Amendment immunity. The U.S. Supreme Court has recognized that sovereign immunity generally does not extend to officials sued in their personal capacity, and this rule is applied in many cases. See, e.g., *Alden*, 527 U.S. at 757; *Hafer v. Melo*, 502 U.S. 21, 27-28, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991) (rejecting absolute immunity to officials sued in their individual capacity).

As noted by the defendants, however, courts in some cases have found that parties design an individual-capacity suit to circumvent Eleventh Amendment protections. Whether a case is found to be an "end-run" attempt to circumvent sovereign immunity has turned on several standards. In some cases, the end-run was found because a state official was simply applying existing State payment practices which the employees claim violated the FLSA. See, e.g., *Luder v. Endicott*, 253 F.3d 1020, 1024 (7th Cir. 2001) (sovereign immunity applied as suit was based on dispute with State's interpretation of FLSA); *Henley v. Simpson*, 527 Fed. Appx. 303, 307 (5th Cir. 2013) (unpublished opinion) (highway patrol K-9 officers' suit against official was attacking existing state policy that time they spent in housing, feeding, and grooming dogs was not compensable). If, however, the supervisor violates the employer's own policies for paying overtime in compliance with the FLSA, a suit against an individual government

8

employee has been allowed to proceed. See, e.g., *Parker v. Prairie View A & M University*, 145 F. Supp. 3d 702, 706 (S.D. Tex. 2015) (individual-capacity suit under FLSA could proceed because official violated State entity's policy of paying overtime in compliance with FLSA).

Courts also have rejected individual-capacity claims in a few other situations. For example, when the number of plaintiffs and defendants are such that there was an "'inescapable' conclusion" that the state would be forced to pay the judgment, one court held the officials were entitled to sovereign immunity. *Luder*, 253 F.3d at 1025 (145-member class action suit against warden and three prison supervisors imposed such burden on individual defendants that states would essentially need to pay judgment or subject managers to future lawsuits). Similarly, when a party seeks injunctive or other prospective relief that significantly impacts the state's interests or administration of its functions, the state was found the real party in interest. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269-70, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) (tribe's request for prospective injunctive relief relating to real estate and water rights against state official in individual-capacity suit made state real party in interest).

The U.S. Supreme Court recently reevaluated whether Eleventh Amendment immunity applies in actions brought by parties against state officials in their individual capacities. In *Lewis v. Clarke*, 581 U.S. ___, 137 S. Ct. 1285, 1289, 197 L. Ed. 2d 631 (2017), the plaintiffs were injured in an automobile accident with a vehicle driven by a tribal employee transporting guests of the tribe's casino. Plaintiffs sued the driver, Clarke, in his individual capacity for negligence; Clarke claimed he was acting within the scope of his employment with the tribe and was thus entitled to claim sovereign immunity. The Court emphasized that in determining the immunity issue, lower courts cannot simply rely on the parties' characterization of the claim but must first determine whether the remedy sought is against the sovereign. 137 S. Ct. at 1290. The Court held that the mere

existence of an indemnification agreement or obligation between the tribe and its employee did not bring the Eleventh Amendment into play. 137 S. Ct. at 1293.

Here, the defendants ask this court to adopt the principles set forth by the Fourth Circuit in *Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014). In *Martin*, the Fourth Circuit held that plaintiff's lawsuit against her supervisors in their individual capacities for unpaid overtime was effectively a suit against the State and barred by Eleventh Amendment immunity. 722 F.3d at 196. To make that determination, the Fourth Circuit set forth the following test:

> "To identify the real, substantial party in interest, we thus examine *the substance* of the claims stated in the complaint, positing inquiries such as: (1) were the allegedly unlawful actions of the state officials 'tied inextricably to their official duties,' (2) if the state officials had authorized the desired relief at the outset, would the burden have been borne by the State, (3) would a judgment against the state officials be 'institutional and official in character,' such that it would operate against the State, (4) were the actions of the state officials taken to further personal interests distinct from the State's interests, and (5) were the state officials' actions ultra vires. [Citations omitted.]" 772 F.3d at 196.

Justice Stegall's dissent quoted *Martin* in the first *Lumry* appeal. *Lumry II*, 305 Kan. at 571. In Justice Biles' concurrence, however, he rejected Justice Stegall's arguments noting that "[t]he dissent offers up a novel Eleventh Amendment immunity test never before used in this state's jurisprudence or even argued by the parties." 305 Kan. at 574. The majority opinion did not directly address this issue. The majority simply noted that "as the dissent and concurrence note, there may or may not be a sovereign immunity argument available to Blecha." 305 Kan. at 568.

State and federal courts have recognized that some suits against state officers are barred by sovereign immunity because the right to immunity is not controlled by who is identified as the defendant if the suits are, in reality, against the State. See, e.g., *Coeur*

10

*d'Alene Tribe of Idaho*, 521 U.S. at 270 ("The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading."). A suit for money damages may be prosecuted against a state officer in his or her individual capacity, however, for wrongful conduct fairly attributable to the officer, so long as the relief is sought not from the state treasury. *Scheuer v. Rhodes*, 416 U.S. 232, 237-38, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); *Arbogast v. Kansas*, No. 13-CV-4007-JAR/KMH, 2014 WL 1304939, at *3-4 (D. Kan. 2014) (rejecting cabinet secretary's claim to Eleventh Amendment immunity to individual claims asserted against her under Family and Medical Leave Act).

Our research reflects that no court outside the Fourth Circuit has applied the *Martin* test. See, e.g., *Gamrat v. Allard*, ___ F. Supp. 3d ___, 2018 WL 1324467, *3 n.2 (W.D. Mich. 2018) (rejecting *Martin* test in § 1983 claim by an elected official challenging her ouster from office). Granted, *Martin* was a claim under the FLSA for unpaid compensation. Even so, district courts within the Fourth Circuit have refused to extend the *Martin* test to claims under § 1983, because the standard would "'absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling government responsibilities.'" *Adams v. NaphCare, Inc.*, 246 F. Supp. 3d 1128, 1138 (E.D. Va. 2017) (quoting *Patterson v. Lawhorn*, No. 1:15-cv-477 [LMB/JFA], 2016 WL 3922051, at * 6 [E.D. Va. 2016]).

To apply the *Martin* test in FLSA cases, however, also would have the effect of immunizing state officials who violate the FLSA in every case that might arise. This would be inconsistent with the FLSA and general principles of sovereign immunity. The FLSA specifically defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d) (2012). The *Martin* test would essentially undermine the FLSA's definition of "employer" by simply eliminating individual liability for unpaid wages

11

"employers" must pay—29 U.S.C. § 207(a)(1) (2012)—or for unlawful actions of retaliation by "any person"—29 U.S.C. § 215(a)(3).

Similarly, the defendants' additional legal support for the *Martin* test strains both the rulings and context of those cases. For example, in *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 280-81, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977), the sovereign immunity issue dealt with whether a local school board was an "arm of the State" for purposes of Eleventh Amendment. The Court found that, under state law, the Board operated sufficiently independently to not qualify as a State entity, even though it received guidance from the State Board of Education and substantial state funds. Thus, it was not entitled to Eleventh Amendment immunity. 429 U.S. at 281.

In contrast, *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984), involved claims against numerous state agencies and officials seeking prospective injunctive relief and asserting state law claims. The Supreme Court rejected the plaintiffs' unique argument that sovereign immunity did not bar the federal court from using pendent jurisdiction to hear claims against the agencies based on alleged state law violations. 465 U.S. at 104-06; see also *Regents of the Univ. of Calif. v. Doe*, 519 U.S. 425, 431, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997) (state university operating federal laboratory was immune under Eleventh Amendment from suit brought by potential lab employee even though State university would be indemnified for any losses by federal government). Contrary to the defendants' contentions, none of these cases directly imposed standards in the fashion crafted in *Martin*.

Not only is Blecha's argument inconsistent with the statutory language of the FLSA, but the defendants misstate the types of damages Lumry was seeking *from the individual defendants*. In their brief, the defendants asserted that Lumry requested both past and future wage losses from the KBI and Blecha and also requested an order "'prospectively enjoining the KBI to reinstate Plaintiff to his employment with the KBI.'"

12

In his petition, however, Lumry sought only monetary damages from Blecha for lost wages, past and future, mental anguish, loss of enjoyment of life, prejudgment interest, and costs including attorney fees. While there was a large overlap between the damages sought from the KBI and Blecha, Lumry requested injunctive relief *only* against the State and the KBI. The United States Supreme Court has given guidance as to where the real party in interest focus should be: the "'general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought.'" *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 248, 256, 131 S. Ct. 1632, 179 L. Ed. 2d 675 (2011).

In conclusion, we believe the district court correctly found that Blecha was not entitled to sovereign immunity. Lumry sued Blecha in his individual capacity for only monetary damages as permitted by the FLSA. See *Garling*, 849 F.3d at 1294. Lumry made no effort to substitute Blecha's successor after Blecha left the KBI, and there is no indication that the state treasury would be implicated in his individual claims. Under the FLSA, Blecha qualified as an "employer" under §§ 203(d) and 216(b) (penalties) and as a "person" under §§ 203(a) and 215(a)(3) (prohibited acts). As a result, we hold that if Lumry can prove his retaliation claims, Blecha would not and should not be protected by sovereign immunity.

QUALIFIED IMMUNITY

Alternatively, the defendants contend Blecha is entitled to qualified immunity from Lumry's claims because the law of retaliation under the FLSA was not clearly established in June 2008 when Blecha terminated Lumry's employment. First, Blecha claims the law was not clearly established that he, individually, qualified as an employer under the FLSA. Second, Blecha argues that it was not clearly established in 2008 that Lumry's verbal complaint that he would not work more than five hours of unpaid overtime was enough to satisfy the "fil[ing] any complaint" requirement of 29 U.S.C.

13

§ 215(a)(3). Finally, Blecha seems to argue that he is qualifiedly immune because his decision had to balance his alleged knowledge of Lumry's FLSA complaints with the evidence presented that Lumry falsified his timesheets. Because of the uncertainties in all these aspects of Blecha's actions, he claims he is entitled to qualified immunity.

Summary judgment is only proper when the pleadings, discovery responses, admissions, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The court must consider all facts and their reasonable inferences in favor of the party against whom the ruling is sought. On appeal, we apply the same standards. If we find that reasonable minds could differ about the conclusions drawn from the evidence, summary judgment must be denied. *Armstrong*, 305 Kan. at 24. When reviewing a summary judgment order on qualified immunity, our job is to view the facts in the light most favorable to the nonmoving party and resolve all facts and reasonable inferences from those facts in their favor. *Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018).

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. ____, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015). Qualified immunity is two-fold. First, it provides a defense to ultimate liability. Second, it provides a limited "'entitlement not to stand trial or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

To overcome qualified immunity, a plaintiff must show that (1) the defendant violated the plaintiff's constitutional or statutory rights and (2) the right in question was clearly established at the time of the alleged violation. *Knopf*, 884 F.3d at 946; *McCormick v. Board of Shawnee County Comm'rs*, 272 Kan. 627, 642, 35 P.3d 815 (2001). The United States Supreme Court permits trial courts "to exercise their sound

14

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Thus, a reviewing court may "'skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.'" *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

Applying the qualified immunity standard is defined by somewhat conflicting principles. Generally, for a statutory or constitutional right to be clearly established, existing court precedent must have placed the statutory or constitutional issues beyond "fair debate." Although this standard does not require a case directly on point, qualified immunity applies only where a reasonable official could have reasonably believed based on existing law that his or her actions did not violate the plaintiff's rights. *Daugherty v. Sheer*, 891 F.3d 386, 390 (D.C. Cir. 2018); *Knopf*, 849 F.3d at 947.

This standard, however, has been tightened by the United States Supreme Court by its later cautions "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). The Court requires the right allegedly violated be "defined at the appropriate level of specificity" before it can be found to be clearly established. *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (qualified immunity turned on whether reasonable officer could have believed that bringing media into home while police executed arrest warrant was lawful). Courts have said that absent *controlling* authority, the plaintiff must show that the state actor's actions were considered unlawful based on "'*a robust consensus of cases of persuasive authority*.'" (Emphasis added.) *Lyons v. Vaught*, 875 F.3d 1168, 1172 (8th Cir. 2017). As a result, "[w]hen properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. at 743. The qualified immunity doctrine enables government officials "to preserve their ability to serve the public good or

to ensure that talented candidates were not deterred by the threat of damages suits from entering public service." *Wyatt v. Cole*, 504 U.S. 158, 167, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992).

In claiming qualified immunity, Blecha first contends that the law was not clearly established that he could be personally liable for the FLSA claims; in other words, Blecha asserts that it was not clearly established in 2008 that he, as the supervisor making the termination decision, was an "employer" under the FLSA. However, the Tenth Circuit Court of Appeals and other courts seemingly have rejected this argument as irrelevant to the qualified immunity protection, which is based on a good-faith basis about *the actions taken*.

In *Gray v. Baker*, 399 F.3d 1241, 1245-46 (10th Cir. 2005), the court was considering whether defendants could properly take an interlocutory appeal from the denial of the qualified immunity to claims made under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq.*, against them by a former employee. Although the court focused on the finality of the order, it also recognized that the defendants' theory— that qualified immunity applied because the law was unclear the defendants could be held individually liable—could not be asserted under the qualified immunity or "good faith" immunity standard. 399 F.3d at 1244. The court recognized that qualified immunity was a judicially created defense designed to shield public officials from liability based on having acted in good faith in carrying out their duties. 399 F.3d. at 1245. The court found that the defendants' theory was not based on them having acted in good faith, but on whether they could be individually liable for the conduct. Such a defense, according to the court, "had no bearing on the decisions defendants made with respect to [plaintiff]." 399 F.3d at 1245; see also *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (qualified immunity shields officials from personal liability "insofar as the conduct does not violate clearly established statutory or constitutional rights").

Several other courts have accepted *Gray*'s reasoning that an official's ability to claim qualified immunity must turn on whether the nature of their *conduct* was clearly established as unlawful and not whether individual liability for that conduct was clearly established. See, e.g., *Radeker v. Elbert County Bd. of Comm'rs*, No. 14-cv-01238-CMA-KMT, 2016 WL 1586391, at *2-3 (D. Colo. 2016); *Brunson v. Forest Preserve Dist. of Cook County*, No. 08 C 2200, 2010 WL 780331 (N.D. Ill. 2010) (assertion that it was unclear "whether some class of defendants is subject to liability . . . has no connection to rules of conduct imposed by that statute"); *Mason v. Massachusetts Dept. of Environmental Protection*, 774 F. Supp. 2d 349, 371 n.163 (D. Mass. 2011) (following the *Gray* decision, finding it consistent with the reasoning of *Mosher v. Nelson*, 589 F.3d 488, 493 [1st Cir. 2009], and its focus on the official's conduct); *Corrado v. New York State Unified Court System*, No. CV 2012-1748 (DLI)(MDG), 2014 WL 4626234 (E.D. N.Y. 2014) (defendant not entitled to qualified immunity since rules governing its conduct were clearly established, even if the rules about personal liability were not clearly established).

Based on the sound reasoning of *Gray* and the cases that followed, Blecha is not entitled to qualified immunity on the basis that the law was uncertain as to whether he could be personally liable for violating the FLSA. This lack of knowledge has nothing to do with whether Blecha acted in good faith in his termination of Lumry.

Blecha's second argument for qualified immunity is that the law was not clear in 2008 that Lumry's verbal statements made to his supervisors, assuming Blecha knew of those statements, could support a retaliation claim.

Various courts within the Tenth Circuit have held that qualified immunity is not clearly available as a defense to FLSA claims. At least one district court within the Tenth Circuit has rejected the defense in that context. See *Robillard v. Board of County of Com'rs of Weld County Colorado*, No. 11-cv-03180-PAB-KMT, 2012 WL 694507, at *2

17

(D. Colo. 2012) (qualified immunity is unavailable on FLSA claims; qualified immunity defense applies to § 1983 claims only). The *Robillard* decision was based on generic statements from several Tenth Circuit cases identifying qualified immunity as a defense from "liability under 42 U.S.C. § 1983." See *DeSpain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001). Courts have rarely addressed whether qualified immunity applies other than to actions under 42 U.S.C. § 1983 claims and the issue is inconsistently resolved. Compare *Barfield v. Madison County Mississippi*, 984 F. Supp. 491, 496 n.8 (S.D. Miss. 1997) (refusing to consider qualified immunity under FLSA when defendant failed to cite support for its applicability), *abrogated on other grounds by Washington v. Fred's Stores of Tennessee, Inc.*, 427 F. Supp. 2d 725 (S.D. Miss. 2006); *Robillard*, 2012 WL 694507, at *2; with *Baker v. Stone County Missouri*, 41 F. Supp. 2d 965, 1003 (W.D. Mo. 1999) (defendant entitled to qualified immunity for FLSA claims).

Turning to whether a *verbal* statement about unpaid overtime or similar FLSA protected right is protected by 29 U.S.C. § 215 was detailed by the Kansas Supreme Court in Lumry's first appeal. There, the court noted that the FLSA's anti-retaliation provision prohibits the discharge of an employee because the employee "'filed any complaint or instituted . . . any proceeding under . . . this chapter, or has testified or is about to testify'" in such a hearing. *Lumry II*, 305 Kan. at 555; 29 U.S.C. § 215(a)(3). The majority of the panel in *Lumry I* held that Lumry's complaints were too equivocal to put the KBI on notice he was alleging FLSA violations. *Lumry I*, 49 Kan. App. 2d at 292. The Supreme Court, however, accepted the dissent's view that Lumry's statements, considering their content and character, were detailed enough to constitute a complaint. *Lumry II*, 305 Kan. at 558-61.

In determining qualified immunity, however, we must focus on the state of the law when Blecha made the termination decision. As early as 1984, the Tenth Circuit recognized that the FLSA's anti-retaliation provision applied to "unofficial assertion of rights through complaints at work." *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 387

18

(10th Cir. 1984). When the Labor Secretary has found violations, the discharge of employees for verbal refusal to return their unpaid wage checks or to release their FLSA claim in exchange for discharge on other grounds violated the anti-retaliation statute. See *Marshall v. Parking Co. of America-Denver, Inc.*, 670 F.2d 141, 142 (10th Cir. 1982); *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 180 (8th Cir. 1975); see also *Valerio v. Putnam Associates Inc.*, 173 F.3d 35, 45 (1st Cir. 1999) (written internal complaint is enough to support retaliatory discharge claim under FLSA); *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir. 1999) (en banc); *E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989 (6th Cir. 1992) (verbal objection under equal pay portion of FLSA sufficient to trigger anti-retaliation provision in FLSA); *E.E.O.C. v. White & Son Enterprises*, 881 F.2d 1006, 1011 (11th Cir. 1989). In addition, the Department of Labor, which enforces the FLSA, has long interpreted the FLSA's language to cover oral, as well as written complaints. *Goldberg v. Zenger*, 43 CCH LC ¶ 31,155, pp. 40,985, 40,986 (D. Utah 1961), cited in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 15, 131 S. Ct. 1325, 179 L. Ed. 2d 379 (2011).

The only three dissenting voices on this point before Lumry's June 2008 termination were from the Second, Fourth, and Seventh Circuits. See *Ball v. Memphis Bar-B-Q Co., Inc*., 228 F.3d 360, 364 (4th Cir. 2000); *Lambert v. Genesee Hosp*., 10 F.3d 46, 55 (2d Cir. 1993) (plain language of statute limits retaliation claim to those who have filed formal complaints, instituted proceeding, or testified), *overruled by Greathouse v. JHS Sec. Inc*., 784 F.3d 105 (2d Cir. 2015). Shortly after Lumry's termination, the Seventh Circuit issued *Kasten v. Saint-Gobain Performance Plastics Corp*., 570 F.3d 834, 839 (7th Cir. 2009) (section 215[a][3] phrase "file any complaint" confirmed that employer could not retaliated under FLSA until official proceedings were begun), *vacated and remanded* 563 U.S. 1, 131 S. Ct. 1325, 179 L. Ed. 2d 379 (2011).

The Tenth Circuit recently reiterated the process in analyzing a qualified immunity defense. In that case, the court held that the parameters of a specific constitutional or

statutory right "are generally only 'sufficiently clear' to put a reasonable official on notice if a plaintiff (1) 'identif[ies] an on-point Supreme Court or published Tenth Circuit decision,' or (2) shows 'the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'" *Perry v. Durborow*, 892 F.3d 1116, 1123 (2018).

Thus, in applying qualified immunity standards to Blecha's defense claims, we cannot ignore that before June 2008 there was clear Tenth Circuit precedent that established retaliation based on unofficial complaints was sufficient to violate the FLSA and that five of the seven circuits addressing the issue aligned with the Tenth Circuit's interpretation of 29 U.S.C. § 215(a)(3). Even though the U.S. Supreme Court did not resolve the split until the *Kasten* decision in 2011, under the *Perry* standard, this issue was clearly established for qualified immunity purposes.

Blecha argues, however, that not only was Lumry's complaint verbal, but it was ambiguous enough that no one could be sure it was a "complaint" under existing law. Reading the record in the light most favorable to Lumry, his comments and Hawkins' response were as follows:

> "[W]e had a—got into a fairly tense discussion where I said, Clint, I'll work an extra 5 hours a week and give you that extra time; but I'm not going to work 10 and 20 hours a week anymore, or more, of unclaimed overtime. And I quote, [he said] that's just what you have to do. And I said—and another quote, 40 hours a week ain't shit. And I said, I'm not working 40 hours a week; I'm working 50 or 60 hours a week. And he said, 50 hours a week still isn't shit. I said, it is when you're not getting paid for that last 10. Again, that is just what you have to do."

Blecha asserts he could have reasonably interpreted Lumry's statement as suggesting an alternative approach to compensation rather than as an outright demand for overtime

compensation, relying on the majority in the prior Court of Appeals' decision in *Lumry I*. Other courts have recognized that internal complaints may, at times, be too ambiguous.

> "Of course, not all abstract grumblings will suffice to constitute the filing of a complaint with one's employer. As the *Clean Harbors* panel acknowledged, affording protection to employees who lodge purely intracorporate complaints 'unhelpfully leaves employers in the dark' as to what types of assertions will rise to the level of protected activity by their employees. *Clean Harbors*, 146 F.3d at 21. We agree that '[t]here is a point at which an employee's concerns and comments are too generalized and informal to constitute "complaints" that are "filed" with an employer within the meaning of the [statute.]'" *Valerio*, 173 F.3d at 44.

However, both Judge Standridge's dissent in *Lumry I* and the majority of the Supreme Court in *Lumry II* rejected the defendants' claims that Lumry's statements were ambiguous. Instead, they held that comments were "'sufficiently clear and detailed for a reasonable employer to understand it . . . as an assertion of rights protected by [the FLSA] and a call for their protection.'" *Lumry II*, 305 Kan. at 558. Assuming Blecha knew even the gist of Lumry's complaints, which is a disputed fact, there is no other reasonable interpretation of his statement other than he refused to work more than five hours per week of unpaid overtime and that Lumry knew that the KBI was obligated to pay him for overtime. Based on the clarity of Lumry's insistence of not working more than a minimal amount of unpaid overtime, Blecha's claim that Lumry's statements were ambiguous—thereby entitling him to qualified immunity—is unpersuasive. Accordingly, we hold that Blecha is not entitled to qualified immunity on this ground.

Undaunted, Blecha raises a final basis that he is entitled to qualified immunity: that despite Lumry's complaints, Blecha had been provided information that Lumry falsified his timesheets. Blecha argues that because of the standards imposed by the *Giglio* case and its progeny, Lumry's credibility as a law enforcement officer would be subject to attack and prosecutors in his cases would have to disclose Lumry's

21

falsifications to criminal cases. See *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (government's failure to disclose impeachment evidence—a nonprosecution agreement made with key witness—violated due process).

Blecha's arguments, however, essentially illuminate a key issue of fact as to Blecha's intent when terminating Lumry. Did Blecha reasonably determine Lumry falsified his timesheets in February 2008, creating a credibility issue reportable under *Giglio*, or did Blecha terminate Lumry because he verbally and vocally refused to allow any more violation of his rights under the FLSA? This kind of question of intent is generally one for the jury to decide. A district court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of the state of mind of one or both parties. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 974, 298 P.3d 250 (2013) (whether contracting parties acted in good faith or bad faith is peculiarly inappropriate issue to resolve by summary judgment).

In other words, this question is at the heart of Lumry's claim and can be resolved only by answering the question whether Lumry presented sufficient evidence to establish that the timesheet falsification claims were a pretext for his termination. Cf. *Seifert v. Unified Government of Wyandotte County/Kansas City*, 779 F.3d 1141 (10th Cir. 2015); *Andres v. City of Coffeyville, Kansas*, No. 16-1079-JTM, 2017 WL 3189924 (D. Kan. 2017) (whether placing police captain on *Giglio* list and then terminating him was pretext for exercise of his First Amendment rights was question of fact for jury). As a result, this argument does not entitle Blecha to qualified immunity for the reasons discussed below.

WHETHER THERE WAS A CAUSAL NEXUS BETWEEN
LUMRY'S PROTECTED ACTIVITY AND HIS TERMINATION

22

Having addressed the defendants' sovereign and qualified immunity claims, we now turn to the merits of Lumry's appeal. Specifically, Lumry asserts that genuine issues of material fact precluded the entry of summary judgment in favor of the defendants. Although Lumry's claims are two-fold—his claim of retaliation against Blecha in violation of the FLSA and his claim of common-law wrongful discharge against the State and the KBI—the district court granted summary judgment to both, finding that Lumry failed to present sufficient evidence linking his FLSA complaints with his ultimate termination.

We review the district court's ruling on a motion for summary judgment de novo, viewing the facts in the light most favorable to the party opposing summary judgment. "If 'reasonable minds could differ as to the conclusions drawn from the evidence'—in other words, if there is a genuine issue about a material fact—summary judgment should be denied.' [Citation omitted.]" *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015).

As noted in the prior appeal, we must apply the *McDonnell-Douglas Corp.* three-step test in determining whether Lumry has established a prima facie case of retaliation under the FLSA.

> "To establish a prima facie claim of retaliation, Lumry was required to provide 'evidence from which a jury could conclude that (1) [he] engaged in a protected activity, (2) [he] suffered an adverse employment action, and (3) a causal connection exists between [his] protected activity and the adverse employment action.' [Citation omitted.]" *Lumry II*, 305 Kan. at 556.

In the prior appeal, the Supreme Court clearly held that Lumry had engaged in protected activity under the FLSA. 305 Kan. at 561. Moreover, there is no dispute that Lumry suffered an adverse employment action:  he was terminated and ultimately decertified as a law enforcement officer in Kansas. Thus, the only question that remained upon remand was whether there was a genuine issue of material fact of a causal nexus between

23

Lumry's protected activity and his termination. Well-established Kansas law places the burden on the employee to provide specific facts of pretext to survive summary judgment. See *Bracken v. Dixon Industries, Inc*., 272 Kan. 1272, 1276, 38 P.3d 679 (2002).

The defendants argue that Lumry failed to establish sufficient facts to create a link between his October 2007 oral complaint and his June 2008 termination. The district court agreed, focusing primarily on the eight-month lapse in time between Lumry's complaint and his termination. Because of the delay, this court held that Lumry needed to present other evidence other than temporal proximity to establish causation, relying on *Conner v. Schnuck Markets*, *Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month lag between plaintiff's protected activity and his termination establishes no causal connection). Although temporal proximity is one of many relevant factors to be considered by the courts in determining whether the employer's explanation is a pretext for retaliation, even "very close" temporal proximity cannot operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext. *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006).

Below, the district court found that Lumry had failed to establish that the investigation into his timesheets was inappropriate; the court also found that Lumry admitted that he altered timesheets. Finally, the court found that Blecha's reliance on the investigation and his decision not to give Lumry a polygraph was not retaliatory. However, the district court's reasoning and the defendants' arguments overlook key aspects of Lumry's evidence attached to the motions for summary judgment. They jump from October 2007 to June 2008 while glossing over the events in between.

As noted by the Tenth Circuit, the temporal proximity inference must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the FLSA complaint and only culminates later in actual discharge. *Marx v. Schnuck Markets*,

24

*Inc.*, 76 F.3d 324, 329 (10th Cir. 1996); cf. *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 377 n.4 (6th Cir. 1984) (reversing judgment for defendant where discharge occurred nearly one and one-half years after complaint but pattern of retaliation allegedly began soon after complaint was filed).

In reviewing the exhibits and testimony attached to the parties' motions for summary judgment and responses, in the light most favorable to Lumry, the following timeline appears.

- 10/22/2001—Keith Lumry joined the KBI as a special agent in southwest Kansas. Supervisory Agent in Charge Ralston was Lumry's direct supervisor.

- 2001-2007—Lumry "negotiated" his overtime with Ralston every two or three months and authorized Ralston to reduce the overtime hours Lumry claimed on his timesheet. Lumry received satisfactory evaluations every year during this period except for the evaluation covering 2004-2005.

- 10/2007—As the task force was being created, Lumry told Hawkins he would not work more than five hours a week of unpaid overtime.

- 01/2008—The KBI formally started up the task force and Lumry became a member; Hawkins became Lumry's direct supervisor.

- 01/18/2008—Hawkins e-mailed Ralston about potential discipline of Lumry. Ralston forwarded this e-mail to KBI Assistant Director Larry Thomas.

- 01/2008—Early in the task force operations, an operation was coordinated from an airport. Several agents, including Lumry, were "grumbling" because they would be

25

over their 80 hours and would not be paid. Hawkins called Ralston and Ralston, through Hawkins, told the agents to complete the operation but to record the time on the next payroll sheet rather than overtime in the current payroll period.

- 02/11/2008—Hawkins first expressed concern about Lumry's timesheets when Lumry reported he had worked more than 80 hours for the two-week period. Hawkins asked Ralston for Lumry's timesheet for the February 10-16, 2008, pay period to review it. Ralston forwarded this e-mail to Thomas.

- 02/2008—Hawkins asked task force Agents Shane Finley and Jason Diaz to log their work activities to compare to Lumry's timesheet. After further review, Hawkins determined Lumry reported work time when he was not with other agents and time that referenced a closed case. In an e-mail to Ralston, Hawkins asserted his belief that Lumry did not accidentally write the wrong case number on his timesheet, and Lumry was claiming more time than other agents.

- 2/27/2008—Hawkins e-mailed Ralston with a copy to Thomas about Hawkins' timesheet review and his belief that Lumry falsified his timesheets. Hawkins also opined that the error was a matter of integrity, not mistake.

- 2/27/2008—Ralston reported Hawkins' concerns to Thomas, who relayed the information to Blecha.

- 2/28/2008—Blecha directed Assistant Director Weingartner to assign an independent KBI agent to review allegations about Lumry's timesheets.

- 03/17/2008—Weingartner assigned Special Agent Ewy to investigate.

- 3/20/2008—Ewy met first with Hawkins. Hawkins advised Ewy that after he first arrived in southwest Kansas, he had received negative reports about Lumry from various local police departments and sheriff's offices. Ewy's report suggested, without naming the source, that Lumry had consistently had productivity problems during his tenure with the KBI.

- 3/20/2008—Ewy received records and reports from Ralston and met with Hawkins about the investigation.

- 4/24/2008—Ewy conducted his first interview with Lumry.

- 05/01/2008—Ewy's memorandum was submitted to Associate Director Kerr regarding administrative inquiry of Lumry.

- 05/20/2008— Ewy later met with Agents Diaz and Riley to discuss the task force's operations during February 2008. Diaz reported that no task force member, including himself or Lumry, completed any significant work on KBI Case 290748 after January 22, 2008; Diaz did not receive additional information or work product from Lumry on that case after that date.

- 5/20/2008—Ewy met with Lumry in Ralston's presence for follow-up questioning on hours claims on February 11 and February 14, 2008. Lumry asked for a Kansas Organization of State Employees (KOSE) representative, and the meeting was rescheduled to May 27, 2008.

- 5/20/2008—Ewy met with Blecha, Thomas, and Ralston to update them on the investigation.

- 05/23/2008—Blecha sent a letter to Lumry placing him on administrative leave, effective immediately.

- 5/27/2008—Ewy met with Lumry, KOSE Representative Don Dooley, and Weingartner.

- 05/30/2008—Ewy submitted a follow-up memorandum report about the Lumry investigation.

- 06/06/2008—Blecha sent a letter to Lumry proposing termination of his employment.

- 06/17/2008—Thomas advised Blecha that Lumry had reported to have had underreported his overtime hours with the knowledge of Ralston and Hawkins.

- 06/20/2008—Blecha met with Lumry and Dooley and explained reasons for proposed termination. Dooley raised various issues about terms of union agreement. Lumry personally did not respond.

- 06/23/2008—Blecha terminated Lumry's employment effective June 24, 2008, at 5 p.m. because Lumry falsified timesheets.

- 06/25/2008—Lumry called in an oral complaint with the U.S. Department of Labor.

Based on the record, quite a bit of activity occurred between Lumry's October 2007 and January 2008 complaints about unpaid overtime and his termination. It is also noteworthy that Hawkins, whose concerns started the investigation, had general

suspicions about Lumry's "work ethic" at least two years prior to the start of the investigation. But the record simply does not explain Hawkins' dislike of Lumry before the task force was created.

When determining whether an employer has proffered legitimate reasons for a disciplinary action, the plaintiff can show pretext by weaknesses, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons so that a fact-finder could rationally find the proffered reason unworthy of credence. With such inconsistencies or contradictions, a jury could infer that the employer did not act for the proffered nonretaliatory reasons. See *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). A pretext argument requires the court to examine the facts as they appear to the person making the decision, to determine whether the employer honestly believed those reasons and acted in good faith upon those beliefs. *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007).

Evidence of pretext often includes: (1) evidence that the defendant's stated reason was false, (2) evidence that the defendant was acting contrary to company policy, and (3) evidence that the plaintiff was treated differently from similarly situated employees. *DeWitt v. Southwestern Bell Telephone Company*, 845 F.3d 1299, 1307-08 (10th Cir. 2017).

Lumry argues that Ralston and Hawkins—to whom he complained about unpaid overtime—had a retaliatory motive in instigating the investigation of his "padded" timesheets after the airport operation where he and others questioned about getting paid for overtime the operation would cause. He asserts that even if Blecha did not know of the FLSA issues, the "cat's paw" theory imputed Ralston's and Hawkins' retaliatory intent to Lumry.

The Tenth Circuit has expressed reservations when trying to "stretch the limits of causation" using the cat's paw theory. Otherwise,

> "any time a biased employee . . . sets in motion the process that leads to an adverse employment action, the employer would be liable, even if the employer then conducted an entirely independent inquiry and decision[-]making process insulated from the animus of the biased employee, and no matter how compelling the nondiscriminatory grounds for taking the adverse employment action. [Citation omitted.]" *Lobato v. New Mexico Environmental Dept.*, 733 F.3d 1283, 1295 (10th Cir. 2013).

However, if the final decision-maker merely relies on possibly biased reports or conclusions of others, rather than conducting an independent investigation, our focus shifts back to the supervisor. See *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484-85 (10th Cir. 2006). Under what has been described as a "rubber stamp" or cat's paw theory of liability, an employer can be liable for the acts of a biased supervisor even if final discipline is imposed by a seemingly neutral higher authority. 450 F.3d at 484-85.

While there is no evidence in the record that Ewy was anything but an independent investigator, the record does reflect that he obtained information from both Hawkins and Ralston and did not independently confirm that information. It is unclear how Ewy came to believe that Lumry had timekeeping and productivity issues his entire KBI career as reflected in both reports. Ewy also accepted at face value Hawkins' report of complaints against Lumry by various local law enforcement agencies. While Ewy focused only on the timesheets for two or three payroll periods (four to six weeks of time), this other negative information remained in his reports viewed by Blecha. The investigation record also included negative e-mails about Lumry from Hawkins to Ralston. The State does not seem to dispute that the task force was busy in its early weeks of operation. Still, Lumry's poor recordkeeping and the delay in the investigation even led Ewy to be unsure whether

Lumry's errors—or lack of clear substantiation of hours worked—during those two payroll periods were intentional or simply mistakes.

Despite the independent investigator's uncertainty, Blecha's decision was that Lumry's timesheets were falsified and that Lumry did not dispute that fact. This finding is made problematic, however, because Blecha did not make clear whether his assertion of the "undisputed" falsification solely was based on Lumry's decision to not speak in their final meeting. With the somewhat limited portions of the record before us, it appears no one clarified whether "falsification" included Lumry's admitted "shaving off" overtime hours at his supervisor's insistence. There is at least some indication in the record that it was not an uncommon practice for employees, either voluntarily or under pressure from above, not to report all the hours they worked. The Labor Department clearly found some wage-hour errors when it ordered the KBI to pay Lumry and others for some wages owed.

We do not question that the honesty and integrity of Kansas law enforcement officers must be above reproach in order for our criminal justice system to function properly. A law enforcement officer who claimed wages for time not worked certainly would be subject to impeachment under the *Giglio/Brady* standard. See *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The extent of impeachment value, however, of evidence that an officer falsified his or her timesheet by under-reporting time worked because of budget issues is much less significant. Based on the totality of the record before us, including Blecha's decision that a polygraph was unnecessary to confirm Lumry's intent, combined with the fact that Ralston never questioned Lumry's timesheets during the five years he directly supervised the agent, we find there to be significant questions about whether Blecha's decision to impose the ultimate sanction of termination was a pretext to conceal lax compliance with the FLSA by the KBI.

For these reasons, we reverse the district court's finding that Lumry failed to come forward with sufficient evidence to raise a jury question on whether the reasons asserted by Blecha for Lumry's termination were a pretext to retaliate for his refusal to follow the KBI's apparent practice of requiring agents to work unpaid overtime.

COMMON-LAW WRONGFUL DISCHARGE CLAIMS

In *Lumry II*, the Kansas Supreme Court recognized that the state wage and labor laws provided a sufficient public policy basis to support a state law claim of wrongful or retaliatory discharge if an employee can prove that he or she was discharged for seeking to enforce his or her rights under wage-and-hour laws, including enforcement of FLSA overtime pay standards. *Lumry II*, 305 Kan. at 564. However, the court remanded for the district court to evaluate whether the FLSA provided adequate alternative remedies to foreclose the need for a "public policy" common-law action. 305 Kan. at 564.

Whether a federal or state statute provides adequate remedies to forestall claims of retaliatory discharge presents a question of law for which appellate review is unlimited. *Connelly v. Kansas Highway Patrol*, 271 Kan. 944, 952, 26 P.3d 1246 (2001) (Kansas Whistleblower Act provides Kansas classified civil service employees *with permanent status* with adequate exclusive remedy).

As explained in *Flenker v. Willamette Industries, Inc.*, 266 Kan. 198, 202-03, 967 P.2d 295 (1998):

> "The alternative remedies doctrine at issue here, referenced sometimes as preclusion, is a substitution of law concept. Under the alternative remedies doctrine, a state or federal statute would be substituted for a state retaliation claim if the substituted statute provides an adequate remedy. [Citations omitted.]"

See also *Prager v. Kansas Dept. of Revenue*, 271 Kan. 1, 48, 20 P.3d 39 (2001).

In evaluating the adequacy of alternative remedies, the Kansas Supreme Court has weighed whether the alternative avenues are subject to the same procedures as a state-law claim, allowed similar levels of claimant control, and made the same damages available. *Campbell v. Husky Hogs*, 292 Kan. 225, 236, 255 P.3d 1 (2011).

Under the FLSA, violation of federal wage and hour laws entitles qualifying employees to bring an action against an employer to recover unpaid wages due, plus liquidated damages under 29 U.S.C. § 216(b) (2012). Moreover, if an employer violates the anti-retaliation provision of the FLSA, the employee may sue the employer for such legal or equitable relief as may be appropriate, including employment, reinstatement, and payment of lost wages, plus a matching amount for liquidated damages. 29 U.S.C. § 216(b). Employees may bring a lawsuit to recover for these violations in any federal or state court of competent jurisdiction, including through the use of a class action procedure. If a judgment is awarded, the court may also allow reasonable attorney fees plus costs. 29 U.S.C. § 216(b).

For employees of private or municipal employers, the remedies under § 216(b) likely would constitute an adequate alternative remedy, assuming that the Secretary of Labor does not initiate suit on the employee's behalf under 29 U.S.C. § 216(c). See, e.g., *Connor v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1399 (10th Cir. 1997) (employee's common-law retaliatory discharge claim was precluded because of available FLSA remedies); *Scott v. Topeka Performing Arts Center, Inc.*, 69 F. Supp. 2d 1325, 1331 (D. Kan. 1999) (same). If the Secretary of Labor begins a suit on the employee's behalf, however, the employee loses the right to pursue his or her own claim unless the Secretary dismisses the action without prejudice. 29 U.S.C. § 216(c).

Even if § 216 provides adequate alternative remedies for most employees, employees—such as Lumry—of any state or state agency cannot use these remedies because of the Eleventh Amendment and sovereign immunity. The only other available

remedies under the FLSA would be (1) a suit against the supervisor in his or her individual capacity or (2) relief under 29 U.S.C. § 217 (2012). An action against the supervisor in his or her individual capacity has its limits with respect the actual collection of any damages awarded. As for § 217, which permits employees to obtain a prospective injunctive order restraining a State employer from violating the FLSA provisions, *Alden*, 527 U.S. at 757, is of little comparison to the type of relief recoverable, again as a result of the sovereign immunity doctrine.

Accordingly, we find that the FLSA does not provide Lumry with adequate alternative remedies for his claim that he was terminated because of his complaint that he was not being paid overtime properly. Thus, as shown in *Lumry II*, Kansas public policy creates an exception to permit Lumry to pursue state common-law claim of retaliatory discharge. See *Conrad v. Board of Johnson County Comm'rs*, 237 F. Supp. 2d 1204, 1261 (D. Kan. 2002).

CONCLUSION

For the reasons set forth above, the judgment of the district court granting summary judgment to Blecha and the KBI is reversed. We find that Blecha is entitled to neither sovereign nor qualified immunity based on these facts and that Lumry has presented sufficient evidence for a jury to determine whether his termination resulted from retaliation for exercising his rights under the FLSA. Likewise, we reverse the district court's holding that the KBI cannot be held liable under a state common-law retaliatory discharge claim. We hold that there are genuine issues of material fact as to the reasons for Lumry's termination. The case is remanded to the district court for further proceedings.

Reversed and remanded with directions.